Richard B. Lack and wife, Martha S. Lack v. Commissioner.
Lack v. Commissioner
Docket No. 55780.
United States Tax Court
T.C. Memo 1956-222; 1956 Tax Ct. Memo LEXIS 68; 15 T.C.M. (CCH) 1169; T.C.M. (RIA) 56222; 6 Oil & Gas Rep. 931; September 28, 1956
W. F. Nowlin, Esq., Alamo National Building, San Antonio, Tex., for the petitioners. Frank C. Allen, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined deficiencies in petitioners' income tax as follows: Year
Deficiency
1949
$1,797.92
1950
2,667.12
1951
1,882.72
The issues for decision are: (1) Did 13 certain mineral royalty interests owned by petitioners become worthless in 1949 so as to permit a claimed deduction in that year for the cost price thereof? (2) Whether payments in the amount of $499.58 made by petitioners to the Federal Bureau of Land Management in the year 1949 as advance rentals required under applicable regulations upon the issuance of oil and gas leases by that department were properly deductible *69 as rental payments in the year 1949. (3) Whether income received. by petitioners in each of the years 1949, 1950, and 1951, representing payments made to them by Stanolind Oil and Gas Company under a written contract of July 17, 1948, were received as proceeds of the sale of capital assets held for more than six months and as such entitled to long-term capital gain treatment in their income tax returns for each of those years. Findings of Fact The petitioners, husband and wife, residents of San Antonio, Texas, filed joint income tax returns on the community property basis with the collector of internal revenue for the first Texas district for each of the calendar years 1949, 1950, and 1951. The petitioner in the singular herein refers to the husband, Richard B. Lack. Many of the facts have been stipulated and are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part hereof by this reference. The 13 mineral royalty interests in question are described in detail in the stipulation of facts, wherein are given the location of the properties, the fractional interests acquired, the date of purchase [1] and the *70 price paid for each, and to petitioners' 1949 income tax return was attached 13 forms 927, "Proof of Worthless Mineral Rights," with respect to each of the 13 mineral royalty interests, and claiming a deduction from income of the cost price of each, aggregating $3,401.03, all of which claims for deduction were disallowed by the Commissioner in his notice of deficiency, on the ground that the mineral interests did not become worthless in 1949. The royalty interests in question were originally purchased by petitioners because of geophysical work which the oil companies had done in the area, and the further fact that the oil companies had purchased mineral leases on the lands for the drilling and development of same. These oil leases required annual rental payments to keep them in effect. In the year 1949 the oil companies holding mineral leases on these lands failed to pay such rentals, permitting the leases in that year to lapse and thereby abandoned the properties for mineral development. Thereafter, continuously to November 7, 1955, the date of the hearing herein, *71 nothing has been done to revive or secure other mineral leases on any of the lands, and petitioner has continuously since and including the year 1949 regarded his royalty interest in the lands in question of no value. Petitioners in their income tax return for 1953 also claimed as a deduction the cost of the 13 mineral royalty interests which they had theretofore claimed as a deduction in their 1949 return. This was done by petitioners as a "protection" against the disallowance of the deduction claimed in 1949, after having been informed by the internal revenue agent who was then checking the 1949 return that he was going to disallow the claim for 1949, but they had the privilege of claiming it in a later year. The 13 mineral royalty interests in question became worthless and of no value in 1949. In the months of September and October 1947, petitioner and David K. Brooks filed applications with the Secretary of the Interior to have the Department of the Interior issue to them oil and gas leases under the Act of Congress approved February 25, 1920 (41 Stat. 437, as amended), for 18 Federal oil and gas leases; the leases were duly issued in accordance with the applications filed *72 by petitioner and David K. Brooks upon the applications being accompanied by the payment of a portion of the rental due on each of the leases as required by law. At the time the petitioner and Brooks made such applications for the 18 Federal leases, they were required to pay with the application a filing fee, plus one-half of the first year's rental in the amount of 50 cents an acre. The remaining one-half of the first year's rental amount was payable on each separate lease, upon the issuance of that lease. During the year 1949 enough leases were issued to make petitioners' portion of the remaining one-half part of the first year's advance rental amount to the sum of $499.58, which sum petitioner paid to the Department of the Interior during the year 1949 at the rate of 25 cents per acre as provided under the Act of Congress approved February 25, 1920 (41 Stat. 437, as amended), on the 18 oil and gas leases that were the subject of the July 17, 1948, agreement. Petitioners claimed as a deduction in their 1949 joint community income tax return the amount of $499.58 as rentals on the leases issued to petitioner and Brooks during the year 1949, which claim respondent disallowed *73 in his notice of deficiency, with the following explanation: "Lease cost of 25 cents per acre paid in 1949 is disallowed as rental expense for leases acquired from the Department of the Interior." On May 24, 1948, petitioner and Brooks submitted a written offer to the Stanolind Oil and Gas Company, hereinafter sometimes referred to as Stanolind, to sell the leases for which they had made applications for $5 per acre. A statement was made in writing that the offerers were "reasonably certain that our applications are prior to any other filings." On July 17, 1948, petitioner and Brooks, referred to therein as lessees, entered into a contract with Stanolind, designated therein as assignee, headed "OPTION FOR ASSIGNMENT OF OIL AND GAS LEASES," hereinafter referred to as the agreement, with respect to any leases issued under the applications filed with the Department of the Interior. The terms of the agreement granted to the assignee "the right and option to acquire by assignment all of the right" of the lessees in the leases "when and if issued," the consideration as set forth in section 2 "for this option" being the sum of 25 cents per acre, payable on the delivery of the instrument, *74 and the further sum of $1 per acre upon approval of the title by the assignee, and a like sum on the first, second, third, and fourth anniversary dates of each lease as to which title had been approved. The total amounts were "to be paid as consideration for this option agreement irrespective of whether or not Assignee exercises said option as to all or any of said land." The agreement also provided that "the optional right hereby granted" was to enable the assignee to perform exploration work on the leases before the termination of the "option," and that the "option must be exercised, as to each lease, by Assignee within two (2) years from and after the date of actual issuance of the leases," unless all or part of any of the land was included in a unit plan of development, in which event the assignee was to have additional time for the exercise of the "option." Section 7 of the instrument read as follows: "7. If any of said leases are not issued within three (3) years from the date hereof, Assignee may at its election relinquish this option as to any or all of said unissued leases and be discharged from the obligation to make payment for that part of the option consideration not *75 then due as to such unissued leases, or in the alternative Assignee may continue the time for the issuance of said leases for a period of three (3) additional years." Section 8 of the agreement provided the manner in which the "option" was to be exercised and the time within which title was to be examined and any defect found to exist in the title cured by the lessees. The lessees agreed in the instrument to keep the leases in full force and effect "during the option period." Section 13 of the agreement, as amended September 24, 1948, read as follows: "Failure to exercise said option within the time limited shall have the effect of terminating the option granted in this instrument and all rights granted thereby as to any land on which the option is not exercised, but shall not diminish the right of Lessees to receive and retain the full consideration provided in Section 2 hereof, subject, however, to the terms and provisions of Sections 7 and 8 hereof." Prior to the execution of the agreement, petitioner and Brooks had an understanding with a representative of Stanolind, with whom the question of consideration was discussed, that the consideration of 25 cents per acre, payable *76 upon the execution of the agreement, belonged to the representative. The draft issued by Stanolind for the payment was endorsed by petitioner and Brooks and returned to the representative. Petitioner's understanding of the agreement was that he would not be entitled to receive the consideration of $5 per acre until the leases had been issued to him. Rent in the amount of $499.58, computed at the rate of 25 cents per acre, was paid by petitioner to the Department of the Interior at the time the applications for the leases were filed. Stanolind released one of the leases from the agreement in 1949 and another one in 1953, because of lack of value. The release in 1949 was reported by petitioner in his return as a sale made in that year at a profit of $366.72, computed on the basis of a selling price of $1 per acre. The remaining 16 leases were assigned to Stanolind on various dates in 1951, 1952, 1953, and 1954. In each instance the date of execution of the assignment was in excess of 6 months after the issuance of the leases to petitioner and Brooks by the Department of the Interior. Sales of the leases were reported by petitioners in their returns for 1949, 1950, and 1951, *77 with one-half of the resulting gain taxable as gain realized on the sale of capital assets held in excess of 6 months. The year 1947, during which the applications were filed, was used by the petitioners as the time of acquisition, and the date of issuance of the leases by the Department of the Interior was used as the time of sale. Respondent held in his determination of the deficiencies that the leases were sold under the agreement on the dates acquired, and that the gain was taxable as shortterm capital gain on the installment basis. Opinion On the first issue as to whether the 13 mineral royalty interests became worthless in 1949, our ultimate finding of fact in the affirmative is determinative of that issue. The law requires that for income tax purposes losses must be deducted in the year in which they are sustained, however to ascertain same "calls for a practical not a legal test." Lucas v. American Code Co., 280 U.S. 445. In United States v. S. S. White Dental Manufacturing Co. of Pennsylvania, 274 U.S. 398, it is held that a deductible loss is realized upon the happening of some "identifiable event" by which the property is rendered worthless. *78 That event in the instant case was the failure of the oil companies in 1949 to pay rentals to keep in effect their oil leases on the same lands in which petitioners own the royalty interest in question. The failure of the oil companies to pay such rentals amounted to a forfeiture of the oil leases and an abandonment by them of the lands in question for mineral development. It is a matter of common knowledge that the commercial value of prospective oil property is materially affected by the acts of the oil companies with reference thereto. Here it affirmatively appears that the leasing of the land in question by the oil companies for mineral development first created the demand and hence a commercial value for royalty interests therein, and when thereafter the oil companies, in 1949, permitted their leases to lapse, thus abandoning the property for oil development, the royalty interest ceased to have any value in the ordinary channels of trade and became worthless. While respondent does not contend that royalty rights may never become worthless because they run with the land and are not forfeitable and "may become valuable any day", he does cite a paragraph from Roy Nichols, 17 B.T.A. 580, *79 containing some such language. He does not comment thereon or seek to apply same to this case. Whatever the facts may have been in the Roy Nichols case, supra, the facts here do not justify the claim that the royalties in question "may become valuable any day." In November 1955, six years after the leases had lapsed, no new leases had been obtained, nothing had been done toward development of the mineral estate and the royalty interests in question were still of no value. Under the facts here, it would have required the faith of "an incorrigible optimist" to have believed that the value of the properties in question "may become valuable any day". United States v. S. S. White Dental Manufacturing Co. of Pennsylvania, supra.
Under the circumstances petitioners' claim for deduction in 1949 was not adversely affected by claiming same again in 1953. This second filing was not an abandonment of the 1949 claim, but was evidently caused by the remarks of the internal revenue agent to petitioner, from which petitioner thought, to protect their rights, another filing was required. The second issue is whether the payments by petitioners to the Department of the Interior *80 of $499.58 in 1949 were deductible as "rental" under section 23(a)(1)(A), I.R.C. of 1939. Our Court had this identical issue upon substantially the same facts in Olen F. Featherstone, 22 T.C. 763, and in a Court-reviewed opinion we held that such payments were deductible as rentals. Following our decision there, and for the reasons therein given, we hold that the payments here in question were deductible as rentals, and accordingly on this issue petitioners are sustained. The third issue is whether the sale of leases to Stanolind by petitioners resulted in gain taxable as long-term gain, as reported by petitioners, or as short-term gain, as determined by respondent. The gist of petitioner's primary contention on brief is that the substance of the agreement with Stanolind was a contract of sale of the leases, rights to which, he asserts, became vested in him upon the filing of the applications with the Department of the Interior. Petitioner contends in the alternative that if the agreement is held to be an option to purchase, the assets were nevertheless held for more than 6 months, reckoned by the time of issuance of the leases by the Department of the Interior and *81 the exercise of the option to purchase by Stanolind. Respondent contends that petitioner and Brooks acquired no rights to have the leases issued to them by the filing of their applications in 1947, and that the agreement was a contract to sell on an "if and when issued basis" with the result that there could not have been a sale under the agreement until the leases were issued, and that the date of issuance of each lease constituted the date of sale to Stanolind. Aside from the time of acquisition of the leases by petitioner and Brooks, the parties thus differ on the nature of the agreement only as to whether it was a contract of sale, fully effective when executed, as argued by petitioner, or a contract to sell, effective as to each lease when it was issued, as respondent asserts. Petitioner denies that the agreement was an option to purchase and respondent does not oppose that theory. Absent any disagreement on the point, there is no need for us to make a conclusion on the question. Except for a recitation in the preamble setting forth the 18 applications filed in 1947, only one reference was made in the agreement regarding the applications, and that had to do with a fee payable *82 as a condition to the issuance of the leases. The consideration for the agreement was made payable for the right and option to acquire the leases "when and if issued", thus making payment of the agreed purchase price contingent upon the issuance of leases under the pending applications. [2] The reason for such a limitation is apparent. Although Brooks satisfied himself that there were no applications pending for the lands at the time of filing of the claims, as late as May 24, 1948, he and petitioner were only reasonably certain of the priority of their applications, and so advised Stanolind. Issuance of the leases was not only discretionary with the Secretary, but the lands were subject to withdrawal from private acquisition by executive order of the President or an act of Congress. McLennan v. Wilbur, 283 U.S. 414; Jordan v. Ickes, 143 Fed. (2d) 152. The clear intent of the agreement was to deal only in the leases, if and when issued, as distinguished from the applications pending therefor *83 at the time the contract was entered into. Until each lease was issued petitioner had no asset that would meet the conditions fixed by the agreement and there was no acquisition by him of the property sold until that time. Concurrently with the issuance of a lease the instrument became effective as to it and to that extent converted the agreement into a contract of sale with an obligation on the part of Stanolind to pay the full consideration, even though it elected to decline an assignment, as it did in 1949 as to one lease, and in 1953 concerning another one. Payment in 1949 of an installment on the selling price of the lease released from the contract in that year constitutes recognition by Stanolind of its obligation for the full purchase price of $5 per acre irrespective of its optional right. In conclusion we hold that the sale of each lease was made on the date of its issuance and that respondent properly taxed the resulting gain as gain realized from the sale of a short-term capital asset. This conclusion renders unnecessary any consideration of the petitioner's alternative contention. Decision will be entered under Rule 50. Footnotes
1. Dates or years of purchase of the 13 royalty interests were: 2 in 1943; 9 in 1944; 1 in 1945, and 1 in 1946.↩
2. The payment of 25 cents per acre was to be paid to Stanolind's representative and is not treated by either party as part of the consideration for the leases.↩